# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 12, 2024          Decided April 19, 2024

No. 23-3028

UNITED STATES OF AMERICA,
APPELLEE

v.

JESSE R. BENTON,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00569-1)

———

*Denis N. Harper*, appointed by the court, argued the cause for appellant. With him on the briefs were *Matthew D. McGill* and *M. Christian Talley*, appointed by the court.

*W. Connor Winn*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee. *Scott A. Meisler*, Attorney, and *John P. Taddei*, Trial Attorney, entered appearances.

Before: HENDERSON, PAN and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In 2016, Jesse Benton received funds from foreign national Roman Vasilenko and contributed those funds, under his name but on Vasilenko's behalf, to a fundraiser supporting then-Presidential candidate Donald Trump. Vasilenko attended the fundraiser and had his photograph taken with Trump. A jury subsequently convicted Benton of six felonies stemming from the unlawful contribution and related campaign finance filings. Benton appeals on several grounds, including his challenges to the government's decision to prosecute campaign finance crimes under the Sarbanes-Oxley Act, 18 U.S.C. § 1519, the admissibility of an earlier pardoned conviction under Federal Rule of Evidence 404(b) and its use at sentencing, the sufficiency of the evidence and the jury charge. As detailed *infra*, we affirm the district court.

## I. BACKGROUND

### A. Facts

Roman Vasilenko is a Russian businessman involved in multilevel marketing. He was a candidate for a seat in the State Duma—Russia's parliament—during the fall of 2016. He met Roy Douglas "Doug" Wead through their multilevel-marketing work. Wead, an American, previously served as an advisor to President George H. W. Bush and was involved in several federal political campaigns. Through his translator, Vasilenko informed Wead of his interest in visiting the United States. Vasilenko paid Wead $100,000 to attend Wead's Charity Awards dinner and receive an award. Wead provided Vasilenko with a list of potential celebrity attendees and asked Vasilenko which celebrities he wanted to meet. Vasilenko responded with his choices: Oprah Winfrey, Steven Seagal, Vladislav Tretiak and former President Jimmy Carter. But Wead struggled to find a celebrity planning to attend the

awards dinner.[1] Wead proposed an alternative: "[W]hat about Donald Trump?" J.A. 187. Vasilenko agreed and Wead then contacted Jesse Benton.

Jesse Benton is a political operative who led Ron Paul's 2012 presidential primary campaign. He owns a political consulting firm and had significant involvement in the Trump-supporting Great America Political Action Committee (PAC). In November 2015, a federal grand jury indicted Benton for concealing payments from a political committee to a state senator. In the Southern District of Iowa, a jury convicted him of, *inter alia*, "causing false records" under the Sarbanes-Oxley Act, 18 U.S.C. § 1519, and "causing false campaign contribution reports" under Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30104(a)(1) and (b)(5)(A), 30109(d)(1)(A)(i). J.A. 338–39; *see United States v. Benton*, 890 F.3d 697 (8th Cir. 2018). Benton formally stepped down from his role at the Great America PAC in the wake of his conviction but continued to participate in its fundraising efforts. President Trump later pardoned Benton. Benton and Wead knew one another from their work on federal political campaigns.

Benton and Wead spoke shortly after Vasilenko expressed interest in meeting Trump. Benton then communicated with his contacts at the Republican National Committee (RNC). In an email to RNC chief of staff Katie Walsh, Benton claimed he had a friend spending "most of his time in the Caribbean" who "caught the Trump bug" and wanted to "attend a funder and get a photo." J.A. 321–22. The RNC provided information about several fundraisers, including a Philadelphia fundraiser scheduled for September 22, 2016. Vasilenko indicated he was "happy and ready to wire his donation" for the Philadelphia

---

[1] Wead refunded $20,000 to Vasilenko and kept the remaining $80,000 after the awards dinner plans fell through.

fundraiser. J.A. 319. Wead responded to Vasilenko that he and Benton "want to do this correctly." *Id.* Benton then notified the RNC that "[w]e'd like to do the Philly event on 9/22."[2] J.A. 320.

The fundraising committee Trump Victory hosted the Philadelphia fundraiser. Promotional materials noted that contributions were to be allocated to Donald J. Trump for President, Inc., the RNC and various state Republican parties. The materials also explained that any contributions were subject to federal law and "will be used in connection with federal elections." J.A. 325. The event involved two functions: a roundtable discussion and a reception plus photo opportunity. Donors could first attend the roundtable with Trump for a minimum donation of $25,000. Roundtable attendees were automatically invited to the later reception but a donor had to pay $5,400 to attend the reception only.

After some discussion, Benton expressed interest in the pricier roundtable tickets. Benton and Wead sent Vasilenko an apparently false invoice for "consulting work" related to Wead's Charity Awards organization and Vasilenko wired Benton $100,000. Benton ordered two roundtable tickets for "Doug Wead and a guest," at $25,000 each, the day before the Philadelphia fundraiser. J.A. 333. As with the RNC, Benton never disclosed Vasilenko's foreign national status to Trump Victory. And he did not pay for the tickets before the fundraiser. Vasilenko and Wead attended the roundtable and the reception. Photographs show Vasilenko with and near Trump.

---

[2] Benton never disclosed Vasilenko's foreign national status to the RNC and on October 24—after the fundraiser—he disclosed Vasilenko's first name only.

After the event, Vasilenko's translator repeatedly contacted Wead about obtaining the photos. When Vasilenko finally received them, he posted one on social media with the caption "Two Presidents." Vasilenko gained significant attention as a result, including speaking on Russian TV about President-elect Trump and his attitudes toward Russia. Meanwhile, Benton still had not paid for the fundraiser tickets. He finally paid in late October—only $25,000. His contribution form identified himself as the contributor. Benton explained that he "bought the tickets" and gave "them to Doug and Roman, so the money comes from me." J.A. 220. Trump Victory contacted Benton about the missing $25,000—he had originally pledged to pay $50,000—but he never paid it. According to the indictment, Benton kept the remaining $75,000 from Vasilenko's $100,000 payment. Benton's false statements regarding the $25,000 contribution resulted in the fundraising committees' filing of false campaign-finance disclosures.

## B.  Statutory Background

In September 2021, the government obtained a six-count indictment against Benton,[3] charging him with six felonies: conspiracy in violation of 18 U.S.C. § 371 (Count One); soliciting a contribution from a foreign national in violation of FECA, 52 U.S.C. § 30121 (Count Two); serving as a conduit for a FECA "contribution" in violation of 52 U.S.C. § 30122 (Count Three); and "causing false records" in violation of 18 U.S.C. § 1519 of the Sarbanes-Oxley Act (Counts Four, Five and Six). J.A. 17–35.

FECA is an intricate statutory scheme regulating political contributions and expenditures and applies to all phases and participants in the electoral process. *See* 52 U.S.C. §§ 30101–

---

[3] The government also indicted Wead but he died before trial.

30146; *Buckley v. Valeo*, 424 U.S. 1, 12–13 (1976). A "contribution" under FECA includes "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). As relevant here, FECA prohibits (1) a foreign national from making a contribution or donation and (2) *any person from soliciting*, accepting or receiving such a contribution from a foreign national. *Id.* § 30121(a). FECA also forbids making "a contribution in the name of another person." *Id.* § 30122. Violations of FECA can trigger civil or criminal penalties. *Id.* § 30109. Anyone who "knowingly and willfully" commits a violation of the Act which involves "making, receiving, or reporting of any contribution, donation, or expenditure" aggregating $25,000 or more during a calendar year is subject to up to five years' imprisonment and a fine. *Id.* § 30109(d)(1)(A)(i).

The indictment also charged Benton with three counts of "causing false records" under 18 U.S.C. § 1519, part of Sarbanes-Oxley. J.A. 32–34. Enacted in 2002 following the exposure of Enron's massive accounting fraud, *Yates v. United States*, 574 U.S. 528, 535 (2015) (plurality op.), Sarbanes-Oxley prohibits causing "a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" the administration "of any matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1519. A violator faces potential fines and up to twenty years' imprisonment. *Id.* Although the Congress enacted § 1519 in the context of Enron's financial record/document fraud, the Supreme Court has noted that it applies in a "multiplicity of contexts." *Yates*, 574 U.S. at 542 n.5.

## C. District Court Proceedings

Benton moved to dismiss the indictment, arguing (1) the government did not allege that Vasilenko intended to influence the election and (2) § 1519 of Sarbanes-Oxley does not apply to election crimes that can be prosecuted under FECA. The district court explained that "the indictment need not define down the statutory term[ ] of 'contribution'" in detail, J.A. 93, and held § 1519 applicable to a false campaign finance filing. It denied Benton's motion to dismiss but, importantly, "without prejudice so that the defense may raise arguments about these issues in its case in chief." J.A. 94.

Also pre-trial, the government moved to admit Benton's past conviction as "bad act" evidence under Rule 404(b) and as potential impeachment under Rule 609. FED. R. EVID. 404(b), 609. Benton opposed. The district court held the conviction admissible under Rule 404(b) to demonstrate willfulness and "probably" as evidence of a *modus operandi*. J.A. 110. Concluding that Benton's pardon was not based on innocence, the district court also held that the conviction could be used for impeachment under Rule 609.

The district court held a three-day jury trial. The government admitted Benton's pardoned conviction under Rule 404(b). Benton did not testify, mooting the Rule 609 ruling. The parties jointly proposed jury instructions. After deliberating for two days, the jury found Benton guilty on all counts. Benton moved for judgment of acquittal, arguing that the court wrongly admitted the pardoned conviction and the government failed to show Vasilenko's intent to influence a federal election. The court denied the motion and entered judgment.

A probation officer prepared a presentencing report (PSR) that included Benton's pardoned conviction in the criminal

history score calculation. Benton initially objected but, at sentencing, his counsel agreed to the criminal history calculation. The court imposed a within-guidelines sentence of eighteen months' incarceration and twenty-four months' supervised release. Benton now appeals.

## II.    ANALYSIS

Benton's challenges require us to apply different standards of review. He first challenges whether the government can prosecute false election filings under Sarbanes-Oxley, not FECA. *See infra* Section II.A. We review this legal question *de novo*. *See United States v. Fischer*, 64 F.4th 329, 335 (D.C. Cir. 2023). We review Benton's challenge to the admissibility of his pardoned conviction for plain error as well as the pardon's basis for clear error. *See infra* Section II.B.; *Greer v. United States*, 593 U.S. 503, 507 (2021); *Awad v. Obama*, 608 F.3d 1, 6–7 (D.C. Cir. 2010). We decline to consider the pardoned conviction's use at sentencing because Benton invited any error therein. *See United States v. Moore*, 703 F.3d 562, 571–72 (D.C. Cir. 2012). Benton similarly invited error, if any, in the jury charge. *See infra* Section II.C.; *United States v. Laureys*, 653 F.3d 27, 32 (D.C. Cir. 2011). Finally, we reject his attempt to repackage a claim of jury instruction error as a sufficiency-of-the-evidence challenge. *See infra* Subsection II.C.3; *United States v. Reynoso*, 38 F.4th 1083, 1090–91 (D.C. Cir. 2022).

## A.    FECA and Sarbanes-Oxley

Benton claims that the general false records provision of Sarbanes-Oxley, 18 U.S.C. § 1519, cannot be used to prosecute the submission of false reports to the Federal Election Commission (FEC). Instead, according to Benton, the general-specific canon of statutory construction requires the government to prosecute that conduct under FECA's criminal provisions only. *See* 52 U.S.C. §§ 30104(a)(1) and (b)(5)(A),

30109(d)(1)(A)(i). Because we find no congressional intent to foreclose § 1519's application to false FEC reports, we conclude that the government had discretion to prosecute Benton's acts under either FECA or § 1519 of Sarbanes-Oxley.[4]

The Supreme Court has "long recognized that when an act violates more than one criminal statute, the Government may prosecute under either." *United States v. Batchelder*, 442 U.S. 114, 123–24 (1979). "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *Id.* at 124. But the Court has also recognized a general-specific canon of statutory construction: "a more specific statute will be given precedence over a more general one, regardless of their temporal sequence." *Busic v. United States*, 446 U.S. 398, 406 (1980) (requiring the application of a specific sentencing enhancement instead of a general enhancement); *see also Simpson v. United States*, 435 U.S. 6, 15–16 (1978) (rejecting the application of two sentencing enhancements—one specific and one general—to the same criminal activity). According to the High Court, the "general/specific canon" avoids "the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). Our court has also applied the general-specific canon. *See*

---

[4] Indeed, the government may charge false election filings under both statutes. *See* Oral Arg. Tr. 28:15–29:7; *cf. United States v. Comput. Scis. Corp.*, 689 F.2d 1181, 1187 (4th Cir. 1982) (recognizing the government's ability to prosecute under both a "wire fraud or mail fraud statute and the false claims statute"), *overruled on other grounds*, *Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990).

*Galliano v. U.S. Postal Serv.*, 836 F.2d 1362, 1367–70 (D.C. Cir. 1988) (the FEC, not the U.S. Postal Service, has exclusive jurisdiction to regulate solicitations of political contributions).

The question before us, then, is the interaction of these two doctrines: Does the general-specific canon constrain a prosecutor's discretion to determine which overlapping criminal statutes to charge? Benton relies on cases from outside the criminal context to support his position. *See RadLAX Gateway Hotel*, 566 U.S. at 645–46 (interpreting the bankruptcy code); *Galliano*, 836 F.2d at 1367–70 (addressing federal agency jurisdiction). He also relies on the Supreme Court's *Busic* and *Simpson* decisions, which involve sentencing enhancements, not prosecutorial charging decisions. *See United States v. Comput. Scis. Corp.*, 689 F.2d 1181, 1187 (4th Cir. 1982) (distinguishing *Busic* and *Simpson* from a prosecutor's charging decision), *overruled on other grounds*, *Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990). None of this precedent involves the longstanding principle of prosecutorial discretion embraced by *Batchelder*. 442 U.S. at 123–24.

Implied repeal precedent, usually applied when the Congress enacts a specific statute subsequent to a general statute, addresses the general-specific canon in the context of criminal charging decisions—and these cases emphasize congressional intent. In *United States v. Hsia*, the defendant argued that FECA impliedly repealed the more general false statements statute, 18 U.S.C. § 1001. 176 F.3d 517, 525 (D.C. Cir. 1999). We rejected Hsia's argument and found the government could prosecute her false statements under either statute. *Id.* at 525–26 & n.5. In *Galliano*, *supra*, we found that the Congress sought to avoid the FEC and U.S. Postal Service promulgating conflicting regulations but expressed no intent to require prosecutors to choose between intersecting criminal

statutes. *Id.* at 525 n.5 & 526; *see also United States v. Jackson*, 805 F.2d 457, 459–60 (2d Cir. 1986) (rejecting a similar implied repeal claim where "there is no express congressional intent" to do so).

Outside the implied repeal context, courts also focus on congressional intent in deciding this "dueling" statutes issue. In *Computer Sciences*, the Fourth Circuit considered whether the false claims statute foreclosed prosecution under the later-enacted and more general mail fraud and wire fraud statutes. 689 F.2d at 1184. The court found "nothing in the statutory language itself or in the legislative history of the wire fraud, mail fraud and false claims statutes to require a determination that prosecution under one must be at the expense of prosecuting under the other." *Id.* at 1187. Indeed, the *Computer Sciences* court acknowledged the government's right to prosecute "under *both* a wire fraud or mail fraud statute *and* the false claims statute." *Id.* (emphases added). Considering near-contemporaneous enactments, the Second Circuit reached a similar result "[a]bsent more explicit indicia of Congressional purpose to foreclose the use of [the more general statute]." *United States v. Bilzerian*, 926 F.2d 1285, 1300 (2d Cir. 1991); *see also United States v. Schaffner*, 715 F.2d 1099, 1102 (6th Cir. 1983).

Benton's lone precedent in which a court applied the general-specific canon to restrict a prosecutor's charging decision is *United States v. LaPorta*, 46 F.3d 152 (2d Cir. 1994). But *LaPorta* also emphasizes the importance of congressional intent. As relevant here, the *LaPorta* prosecutor charged two defendants with two federal crimes—destroying government property under 18 U.S.C. § 1361 and using fire "to commit any felony" under 18 U.S.C. § 844(h)(1). 46 F.3d at 154, 156. The court found that a different, more targeted subsection of § 844—§ 844(f), prohibiting the destruction of

government property by fire—displaced the more general § 844(h)(1). *Id.* at 156. Because § 844(h)(1) applies if the defendant uses fire or explosives "to commit any felony," using it when "a defendant is charged with destruction of government property by fire" would render the subsection (f) specific offense superfluous.[5] *Id.* at 156–57 (emphasis omitted). Inasmuch as the Congress enacted these provisions *in the same statute*, such a construction was "surely not the Congressional intent." *Id.* The *LaPorta* court reviewed the legislative history and concluded that the Congress intended that a prosecution for destruction of government property by fire proceed under § 844(f) only. *Id.* at 157. The sparse caselaw that applies the general-specific canon to a prosecutor's charging decision, then, turns on whether the Congress has expressed an intent to foreclose one statute's application.

18 U.S.C. § 1519 uses broad, but clear, language. Submitting false campaign reporting information plainly falls under "mak[ing] a false entry in any record, document, or tangible object." Filing reports is a matter "within the jurisdiction" of the FEC, *Benton*, 890 F.3d at 711, and other circuits have upheld prosecutions under § 1519 for campaign finance offenses—including the earlier prosecution of Benton in the Southern District of Iowa. *See e.g.*, *id.*; *United States v. Emmons*, 8 F.4th 454, 458 (6th Cir. 2021) (affirming conviction under § 1519 for false corporate contributions); *United States v. Rowland*, 826 F.3d 100, 111 (2d Cir. 2016) (affirming conviction under § 1519 for falsification of a record during an FEC investigation).

---

[5] As the Second Circuit clarified, "where a defendant is charged with *destruction of government property* by fire, the government must proceed under § 844(f)." *LaPorta*, 46 F.3d at 157. Section 844(h)(1) nonetheless applies to predicate felonies other than the destruction of government property. *Id.*

Like its statutory text, Sarbanes-Oxley's legislative history suggests no congressional intent to foreclose § 1519's applicability to election-related crimes. The Senate Committee on the Judiciary explained the provision's broad purpose: "people should not be destroying, altering, or falsifying documents to obstruct any government function." S. REP. NO. 107-146, at 15 (2002). As noted *supra*, the Supreme Court has acknowledged the statute's applicability in a "multiplicity of contexts." *Yates*, 574 U.S. at 542 n.5. Because we find no congressional intent in either the statute's text or its legislative history to prohibit § 1519's applicability to election crimes, the government is free to exercise its discretion to prosecute under either or both statutes. *See Benton*, 890 F.3d at 711 ("[A] defendant may properly be convicted for violations of [FECA] and of § 1519.").

## B.   Admissibility of Pardoned Conviction

Benton argues that the district court's admission of his 2016 conviction constituted error because President Trump pardoned him in 2020. He alleges similar error in the court's use of the pardoned conviction at sentencing.

### 1.   Rule 404(b) Admissibility

Under Federal Rule of Criminal Procedure 51, a party must preserve a claim of error in trial court. FED. R. CRIM. P. 51(b). Otherwise, plain error review applies. FED. R. CRIM. P. 52(b); FED. R. EVID. 103(e). Benton did object pre-trial to the pardoned conviction's admission. But he never preserved his current challenge—that the pardon *itself* makes the conviction inadmissible under Rule 404(b). Instead, he based his pre-trial challenge on the earlier offense's lack of clarity, arguing that admission would require a mini trial on complex facts, the jury would engage in propensity analysis and he would face potential prejudice because a polarizing President issued the

pardon. He separately argued that the pardon prevented admission of the conviction for impeachment under Rule 609. Because Benton did not preserve his current challenge, we review for plain error. *Greer*, 593 U.S. at 507. Plain error review requires Benton to show (1) an error; (2) that is plain— i.e., clear or obvious; (3) and affects "substantial rights"—i.e., there is a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* at 507–08 (quotation omitted); *see United States v. Olano*, 507 U.S. 725, 734 (1993). The defendant carries the burden to establish entitlement to relief. *Greer*, 593 U.S. at 508. If he does so, then the appellate court—in its discretion—may grant relief if the error seriously affects "the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 135 (2018)).

Rule 404(b) prohibits admitting evidence of "any other crime, wrong, or act" to show criminal propensity. FED. R. EVID. 404(b)(1). That evidence may be admitted for other purposes, however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). Rule 609 covers admission of a criminal conviction to impeach a witness. FED. R. EVID. 609. Evidence of a pardoned conviction may not be admitted for impeachment if, *inter alia*, it is based on a "finding of innocence." FED. R. EVID. 609(c)(2).

Nothing in Rule 404(b)'s text affects the admissibility of "bad act" evidence simply because the act resulted in a pardoned conviction. Although Benton claims Rule 609 includes considerations unconnected to impeachment but applicable to Rule 404(b), we have previously rejected an invitation to read Rule 609 policies into Rule 404(b). *See United States v. Rogers*, 918 F.2d 207, 210–11 (D.C. Cir. 1990) (noting that Rule 609 governs "only the admissibility of

evidence introduced for impeachment" and declining to read its policies into the plain language of Rule 404(b)). We reject Benton's analogous invitation. And under the modern understanding of a Presidential pardon's effect, it "does not blot out guilt" or create a factual fiction that conviction never occurred. *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994) (citing *Burdick v. United States*, 236 U.S. 79, 91, 94 (1915), *Bjerkan v. United States*, 592 F.2d 125, 128 n.2 (7th Cir. 1975), and *United States v. Noonan*, 906 F.2d 952, 960 (3d Cir. 1990)). The district court therefore committed no error in admitting Benton's pardoned conviction under Rule 404(b).

Even if we applied Rule 609 to interpret Rule 404(b)—so that a pardon based on innocence could not be admitted—we would affirm the district court's conclusion that Benton's pardon did not evince his rehabilitation or innocence.[6] We review the district court's factual finding regarding the pardon's basis for clear error. *See Awad*, 608 F.3d at 6–7 (reviewing district court's factual findings based on documentary evidence for clear error). The Court finds clear error only if it "is left with the definite and firm conviction that a mistake has been committed." *Id.* at 7 (internal quotations omitted).

We find no clear error in the district court's conclusion that Benton did not obtain an innocence-based pardon. Other circuits have interpreted Rule 609(c) strictly, requiring an "express finding" of rehabilitation or innocence. *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 435 (2d Cir. 1993); *see also U.S. Xpress Enters., Inc. v. J.B. Hunt Transp., Inc.*, 320 F.3d 809, 816 (8th Cir. 2003). Some Presidential pardons have explicitly noted the pardoned individual's innocence. *See, e.g., Prisament v. United States*, 92 Ct. Cl. 434, 435 (Ct. Cl.

---

[6] The trial court provisionally admitted the pardoned conviction before trial to impeach Benton but he did not testify.

1941). Often, a Presidential pardon issues "without purporting to address . . . innocence or guilt." *United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) (en banc) (per curiam). Like the *Schaffer* pardon, Benton's pardon is "Full and Unconditional" but is silent as to innocence or rehabilitation. J.A. 46; *Schaffer*, 240 F.3d at 38. Unlike the *Prisament* pardon, the face of Benton's pardon makes no mention of rehabilitation or innocence. Benton places great weight on the accompanying White House press release but it is likewise silent as to Benton's rehabilitation or innocence. Although it recites that one of Benton's sponsors—a former FEC chairman—believed the reporting law Benton violated was "unclear and not well established at the time," J.A. 53–54, his belief in no way constitutes an "express finding" of innocence, *Zinman*, 983 F.2d at 435. Benton's pardon is best understood as "an act of grace." *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160 (1833).

## 2.  Use at Sentencing

Under the Sentencing Guidelines, "[s]entences for expunged convictions are not counted" in the computation of criminal history. U.S.S.G. § 4A1.2(j). A conviction set aside "for reasons unrelated to innocence or errors of law" is counted. *Id.* cmt. n.10. Benton believes he received an innocence-based pardon and so he claims the sentencing court erroneously included the pardoned conviction in his criminal history calculation.

We decline to review Benton's sentencing challenge because he waived his initial objection and invited any error made in the PSR calculation. *See Moore*, 703 F.3d at 571–72; *see also Rogers*, 918 F.2d at 212 ("If . . . a lawyer has acquiesced in a ruling he once claimed was erroneous, the lawyer must reassert his prior objection if he expects to

preserve it for appeal."). In *Moore*, a defendant filed written objections to the PSR's criminal history calculation. 703 F.3d at 571. At sentencing, Moore "withdrew his earlier written objections" and accepted the PSR's criminal history calculation. *Id.* at 571–72. We declined to review Moore's waived sentencing challenge on appeal. *Id.* at 572. Benton's challenge is indistinguishable from *Moore*. He filed a written objection to the PSR's inclusion of his pardoned conviction in the criminal history calculation. But after the district judge read the criminal history calculation at sentencing, Benton's counsel reserved a variance challenge and informed the court he had no other objection. Benton acquiesced in the criminal history calculation and thus invited any error contained therein. *Id.* at 571 (finding invited error under the same circumstances).

### C.   Jury Instructions

Benton challenges several jury instructions. He argues that the district court erroneously instructed the jury to consider the pardoned conviction to show identity, *inter alia*, even though Benton's identity regarding the present conviction was undisputed. Benton also alleges error in the district court's instructions regarding a FECA "contribution." We decline to review Benton's jury instruction challenges under the invited error doctrine.

### 1.   Rule 404(b) Jury Instruction

We have long held that "a litigant cannot avail himself of an error that he induced the court under review to commit." *Wagner v. Taylor*, 836 F.2d 596, 599 (D.C. Cir. 1987). A defendant's intentional relinquishment or waiver of an issue precludes an appellate court from reviewing it on appeal. *See United States v. Laslie*, 716 F.3d 612, 614 (D.C. Cir. 2013) (citing *Olano*, 507 U.S. at 733). A party who challenges a jury instruction on appeal after having proposed the instruction's

language commits "a textbook case of invited error." *United States v. Maradiaga*, 987 F.3d 1315, 1322 (11th Cir. 2021); *see United States v. Thomas*, 999 F.3d 723, 732 (D.C. Cir. 2021) ("[W]hen a defendant makes a 'tactical decision' to request a certain jury instruction, he is barred from complaining about the instruction on appeal; any error was 'invited' by the defendant." (citations omitted)); *United States v. Wiggins*, 530 F.2d 1018, 1020 (D.C. Cir. 1976). Challenging a jointly proposed jury instruction can also trigger invited error. *See Laureys*, 653 F.3d at 32.

We decline to review Benton's challenge to the Rule 404(b) instruction because any error therein was invited. The parties jointly proposed an instruction regarding "Evidence of Other Crimes Admitted to Show Motive, Identity, or Common Scheme or Plan." J.A. 123. When the government introduced Benton's 2016 conviction at trial, Benton approved the court's reading of the proposed limiting instruction—which allowed the conviction's use for identity only.[7] The final, jointly proposed instruction repeated the identity limitation and added

---

[7] The court instructed the jury:

> If you find that Mr. Benton committed these other crimes, you may use this evidence only for the limited purpose of deciding whether the circumstances of the other crimes and the charged offenses are *so similar* that it is likely that *the person who committed those crimes also committed the crimes alleged in this indictment.*
>
> If you conclude that the crimes in that prior conviction are so similar to the charged offenses that it is likely that the same person committed both of them, you may use this evidence in determining whether the Government has proved beyond a reasonable doubt that Mr. Benton is the person who committed the election-related crimes charged in this indictment.
>
> You may not use this evidence for any other purpose.

J.A. 272–73 (emphases added).

the government's "knowingly and on purpose and willfully" language. J.A. 386. Benton's joint proposal of the Rule 404(b) instruction and his approval thereof constitute invited error. Despite our concern with a jury charge that allows it to use Rule 404(b) evidence for identity if the case presents no identity dispute, *see Lovely v. United States*, 169 F.2d 386, 391 (4th Cir. 1948), our precedent bars Benton's challenge.

## 2. FECA "Contribution" Instruction

We also decline to review Benton's challenge to the FECA "contribution" charge. The parties jointly proposed those instructions—which included FECA's statutory definition of contribution: anything of value "made by any person for the purpose of influencing any election for Federal office," 52 U.S.C. § 30101(8)(A)(i)—and the final charge included this statutory language.

Benton protests that his pretrial motion to dismiss sufficiently preserved his FECA jury instruction challenge. In *United States v. Wilson*, the district court had made a "definitive and sweeping" pretrial ruling which "rendered futile any later attempts" by the defendant to renew his objection. 26 F.3d 142, 160 (D.C. Cir. 1994). Following such an unconditional and final pretrial ruling, the defendant had no obligation to repeat his "concerns at the time when the jury was instructed." *Id.* at 159. Benton's motion to dismiss argued that the indictment failed to allege that Vasilenko's general purpose was to influence an election. The district court dismissed the motion but not with the definitive and final language used in *Wilson*. It found Benton's indictment "sufficiently pled" and noted that the indictment need not "define down the statutory term[ ] of 'contribution.'" J.A. 93. And, critically, the court granted the motion "without prejudice so that the defense may raise arguments about these issues in its case in chief." J.A. 94.

Benton failed to take up the court's offer and, accordingly, failed to adequately preserve his jury instruction challenge on appeal.

### 3. Sufficiency of the Evidence on FECA Charge

Benton repackages his FECA jury instruction challenge as a sufficiency-of-the-evidence claim. If the government produces insufficient evidence to satisfy its burden of proof, the Double Jeopardy Clause requires acquittal. *Reynoso*, 38 F.4th at 1091. According to Benton, the government produced insufficient evidence of Vasilenko's subjective, primary purpose to influence an election and thus he seeks a judgment of acquittal. In *Reynoso*, the defendant made both a jury instruction challenge and a sufficiency-of-the-evidence claim. *Id.* at 1090. After trial but before appeal, the Supreme Court, in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), determined that a felon-in-possession conviction required proof of the defendant's knowledge of his felon status. *Reynoso*, 38 F.4th at 1090. Nevertheless, we explained that a sufficiency-of-the-evidence claim was "unavailable." *Id.* The government was not required to prove the knowledge element at Reynoso's trial and so we described the insufficiency claim as a "non sequitur." *Id.* at 1091. Instead, "the challenge is 'properly understood as a claim of trial error' in failing to instruct the jury on the omitted element." *Id.* (quoting *United States v. Johnson*, 979 F.3d 632, 637 (9th Cir. 2020)).

*Reynoso* requires that we reject Benton's sufficiency-of-the-evidence challenge. The law of our circuit at the time of trial did not require the government to prove Vasilenko's primary purpose. *See Reynoso*, 38 F.4th at 1091 (citing *United States v. Kim*, 65 F.3d 123, 126–27 (9th Cir. 1995)). And *Reynoso*'s holding "is equally true as to elements that the law *at the time of appeal* does not require the government to prove."

*United States v. Brock*, 94 F.4th 39, 47 (D.C. Cir. 2024) (emphasis added). Because no court has yet required a demonstration of primary purpose under FECA's definition of "contribution," we find Benton's insufficiency claim to be a "non sequitur." *Reynoso*, 38 F.4th at 1091. "[A] defendant cannot make out a sufficiency challenge as to offense elements that the government had no requirement to prove at trial under then-prevailing law." *Id.* Otherwise, a defendant could repackage a claim of jury instruction error as a sufficiency-of-the-evidence challenge to reach a result of acquittal. We reject Benton's attempt to do so here.

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*